**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

JASON BAEZ,

    *Plaintiff,*

*v.*                               Case No. 4:25-cv-00216-MW-MAF

RICKY DIXON, in his official capacity
as Secretary of the Florida Department
of Corrections,

    *Defendant.*

---

**SECRETARY'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW**

Ricky Dixon, in his official capacity as Secretary of the Florida Department of

Corrections, ("Secretary" or "Department"), pursuant to Federal Rule of Civil

Procedure 56 and Local Rule 56.1, responds to Plaintiff's Motion for Summary

Judgment (DE 52) and files its Cross Motion for Summary Judgment.

**INTRODUCTION**

Florida law provides that inmates, upon conviction, are liable to the state for the

costs of their incarceration. *See* § 960.293(2), Fla. Stat. The Legislature has set liquidated

damage amounts for incarceration costs based on the type of offense and duration of

sentence. *Id.* 960.293(2)(a)-(b). And the State of Florida can, at its discretion, move to

1

recover those costs from inmates and obtain a lien for the unpaid balance. *Id.* §
960.292(2).

Plaintiff Jason Baez, while serving a 30-year prison sentence, settled a lawsuit
against the Department and its medical contractor. The Department subsequently
obtained a lien on Plaintiff's inmate trust account for the costs of his incarceration. The
Department withdrew all funds from Plaintiff's account, disbursed them to the State of
Florida's General Revenue Fund in partial satisfaction of his debt to the State, and
imposed a lien on the account for the unpaid balance. Plaintiff sued under 42 U.S.C. §
1983 to enjoin the lien and return the funds, alleging that the cost of incarceration lien,
as applied to him, is preempted because it frustrates frustrate the purpose of 42 U.S.C.
§ 1983.

But this form of obstacle preemption sets a high bar that Plaintiff does not meet.
Moreover, accepting Plaintiff's argument would lead to absurd results that Congress did
not intend. Accordingly, because there are no disputed issues of material fact and
Plaintiff does not demonstrate preemption, the Department is entitled to summary
judgment as a matter of law.

## **UNDISPUTED FACTS**

On May 11, 2006, the Sixth Judicial Circuit Court in and for Pasco County
sentenced Plaintiff to third years in prison for a non-capital felony offense. Def.'s Resp.
to RFA No. 1, ECF No. 53-1 at 3.

On December 13, 2019, Plaintiff filed suit in the United States District Court for the Northern District of Florida under 42 U.S.C. § 1983 against the Department's former Secretary, four correctional officers, and three medical professionals employed by the Department's medical contractor, Centurion of Florida, LLC. Def.'s Resp. to RFA No. 3, ECF 53-1 at 4. Plaintiff settled with the corrections officers for $60,000 on September 28, 2021. Def.'s Resp. to RFA No. 8, ECF No. 53-1 at 6. The Division of Risk Management ("Risk Management"), a division of the Florida Department of Financial Services, indemnified and paid the settlement to Plaintiff on behalf of the corrections officers under a certificate of coverage issued to the Department for federal civil rights liability. Def.'s Resp. to RFA Nos. 9, 11, ECF No. 53-1 at 6-7; Def.'s Supplemental Resp. to RFA No. 10, ECF No. 53-2 at 3. On February 8, 2022, Plaintiff's attorneys deposited $40,000 from that settlement into his trust account. Def.'s Response to RFA No. 13, ECF No. 53-1 at 7; Baez Trust Account Statement ("Baez Statement"), ECF No. 53-6 at 1.

Centurion signed a separate and confidential settlement with Plaintiff on behalf of its medical contractors on September 27, 2022. Declaration of Jason Baez ("Baez Decl."), ECF No. 53-3 at ¶ 6. On November 15, 2022, Plaintiff's attorneys deposited $327,449.27 into his trust account. Def.'s Response to RFA No. 14, ECF No. 53-1 at 7. Baez Statement, ECF No. 53-6 at 3. All told, after deducting attorneys' fees and costs from the two settlements, Plaintiff's attorneys deposited $367,449.27 into his inmate

trust account. Baez Decl., ECF No. 53-3 at ¶ 7. The Northern District of Florida dismissed the case on August 2, 2022. Order of Dismissal, ECF No. 53-4 at 1.

Pursuant to Florida's Civil Restitution Act ("Act), sections 960.29-960.298, Florida Statutes, Plaintiff, upon his conviction, became liable "to the state and its local subdivisions for damages and losses for incarceration costs and other correctional costs." *See* § 960.293(2), Florida Statutes. On July 11, 2024, the Department filed a motion in the Sixth Judicial Circuit to impose a cost of incarceration lien upon Plaintiff's inmate trust account. Def.'s Resp. to RFA No. 19, ECF No. 53-1 at 9. The Department sought the full "liquidated damage amount of $50 per day" for each day of Plaintiff's 30-year prison sentence, or $547,850.00, pursuant to section 960.293(2), Florida Statutes. Def.'s Resp. to RFA No. 20, ECF No. 53-1 at 9. The Sixth Circuit Court granted the motion and imposed the lien, plus statutory interest, on July 11, 2024. Def.'s Resp. to RFA No. 21, ECF No. 53-1 at 9; Order Granting Civil Restitution Lien, ECF 53-5.

On July 19, 2024, the Department placed a hold on Plaintiff's trust account in the amount of the lien. Def.'s Resp. to RFA No. 23, ECF No. 53-1 at 10. On February 12, 2025, pursuant to the Sixth Judicial Circuit's order, the Department executed the lien by withdrawing the balance of Plaintiff's inmate trust fund account. Def.'s Resp. to RFA No. 27, ECF No. 53-1 at 11; Baez Statement, ECF No. 53-6 at 8, 10. But because Plaintiff did not have sufficient funds in his account to cover his liability, the Department retained a lien on the account for the balance. Def.'s Resp. to RFA No. 31,

4

ECF No. 53-1 at 12; *see also* Rule 33-203.201(10)(e), F.A.C. The Department disbursed all of the funds withdrawn from Plaintiff's account to the State of Florida's General Revenue Fund. Def.'s Resp. to Interrog. No. 3, ECF No. 53-7 at 5.

## LEGAL STANDARD

The summary judgment standard is well known. Summary judgment is proper when a party can show (i) there is no genuine dispute of material fact and (ii) the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Which facts are "material" depends on the substantive law that applies to the claim(s) at issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And conclusory allegations and unsupported statements aren't enough to avoid summary judgment. *Ellis v. England,* 432 F.3d 1321, 1327 (11th Cir. 2005).

## ARGUMENT

There are no disputes of material fact and Plaintiff does not meet the high threshold for obstacle preemption. First, the text of section 1983 does not show that Congress intended judgments issued thereunder to compensate plaintiffs for constitutional violations and deter future violations. Second, even accepting those proffered goals, Plaintiff does not show that the Act stands as an obstacle to accomplishing or executing those purposes. Indeed, the two cases he relies entirely upon are inapposite and do not support his argument. Moreover, accepting Plaintiff's

argument would insulate section 1983 awards and settlements from any subsequent collection proceedings – an absurd result that Congress did not intend. Accordingly, Defendant is entitled to summary judgment as a matter of law.

I.   **Florida's civil restitution lien statute does not conflict with the purposes and objectives of Section 1983.**

The Supremacy Clause of the Constitution "supplies a rule of priority." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019). It provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." *Id.* (quoting U.S. Const. art. VI, cl. 2.). From this clause, we have the preemption doctrine, which states that "any state law that 'interfere[s] with, or [is] contrary to,' federal law is preempted." *Estrada v. Becker*, 917 F.3d 1298, 1302 (11th Cir. 2019) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)).

"Although preemption law cannot always be neatly categorized, [courts] generally recognize three classes of preemption." *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012). The first is express preemption, which arises when a federal statute explicitly states that it preempts a state law. *Id.* The second is field preemption, which "occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it.'" *Id.* (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008)). Last is conflict preemption, which occurs "where (1) compliance with both federal and

state regulations is a physical impossibility, or (2) the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939 (11th Cir. 2013) (citation modified) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). One feature unites them all. "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to a constitutional text or a federal statute that does the displacing or conflicts with state law. *Va. Uranium*, 587 U.S. at 767 (citation modified) (quoting *Puerto Rico Dep't of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U.S. 495, 503 (1988)).

A. Courts examine the federal statute's text to determine if a state statute stands as an obstacle to its objectives.

"[A] high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in part and concurring in judgment)). That is because "[t]he preemption of state laws represents a serious intrusion into state sovereignty." *Va. Uranium*, 587 U.S. at 773 (quotation modified) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 488 (1996)).

"What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended

7

effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000); *see also, e.g.,* *Alabama*, 691 F.3d at 1281. The party asserting preemption, however, must show more than "[t]he mere fact of tension between federal and state law . . . particularly when the state law involves the exercise of traditional police power." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (citing *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 256 (1984) (holding that state award of punitive damages to person injured in nuclear incident did not conflict with federal remedial scheme regulating safety aspects of nuclear energy)). Rather, "[t]he principle is thoroughly established that the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'" *Jones v. Rath Packing Co.,* 430 U.S. 519, 544 (1977) (Rehnquist, J., dissenting in part and concurring in part) (quoting *Kelly v. Washington,* 302 U.S. 1, 10 (1937)). And the "preemption analysis must contemplate the practical result of the state law, not just the means that a state utilizes to accomplish the goal." *Alabama*, 691 F.3d at 1296.

Courts follow two principles in all preemption cases. "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Lohr*, 518 U.S. at 485). Second, courts assume that "the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Fresenius*, 704 F.3d at 939-40 (quoting *Arizona*, 567 U.S.

at 400); *accord Wyeth*, 555 U.S. at 565, 575 (explaining the presumption against preemption).

"Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1186 (11th Cir. 2017) (quoting *Lohr*, 518 U.S. at 486); *accord Fresenius*, 704 F.3d at 939. Accordingly, "[w]hen interpreting a statute, [courts] do not typically resort to legislative history when a statute is relatively clear, especially not to undermine the plain meaning of the statutory language." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1096 (11th Cir. 2021) (citation modified) (quoting *CSX Corp. v. United States*, 909 F.3d 366, 369 (11th Cir. 2018)). This principle equally applies to a court's preemption analysis. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 519–21 (1992). That is because Congress's "authoritative statement is the statutory text, not the legislative history." *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 568 (2005); *see also Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 149–50, 149 n.4 (2002). "The only thing a court can be sure of is what can be found in the law itself." *Va. Uranium*, 587 U.S. at 779. Thus, any "evidence of pre-emptive purpose, whether express or implied, must therefore be sought in the text and structure of the statute at issue." *Id.* at 778 (citation modified) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).

For example, in *Club Madonna Inc. v. City of Miami Beach*, a fully nude strip club claimed that a City of Miami Beach ordinance conflicted with, and was thus preempted

by, the Immigration Reform and Control Act of 1986 ("IRCA"). 42 F.4th 1231, 1239 (11th Cir. 2022). The ordinance required nude strip clubs to verify that their performers are either U.S. citizens, legal residents, or are otherwise permitted to work in the United States. *Id.* And the club argued the ordinance stood as an obstacle to the goals of the IRCA because the latter expressly exempts independent contractors and casual hires from its requirement to verify that workers are legally permitted to work in the country. *Id.* at 1254.

To set the stage for its analysis, the Eleventh Circuit explained that analyzing the club's preemption claim requires "determin[ing] whether Congress made a deliberate choice to exclude independent contractors and casual hires from the employment-verification process." *Id.* And then it "examine[s] whether the [o]rdinance's verification requirements stand as an obstacle to that objective." *Id.* In other words, courts ask whether Congress clearly intended the federal statute to do what allegedly conflicts with the challenged state statute. Then they determine whether the practical effect of the state statute stands in the way of the federal statute achieving Congress's explicit objective.

Here, Plaintiff claims the Act conflicts with section 1983's twin goals of "1) compensating individuals harmed by constitutional violations by state actors, and 2) deterring those state actors from unconstitutional conduct." Motion at 8. Thus, this Court must determine whether Congress clearly intended section 1983 awards and settlements to accomplish both goals. And then, because Plaintiff brings this as an as-

applied challenge, the Court must determine whether imposing a cost of incarceration lien upon Plaintiff's section 1983 settlement stands in the way of (a) compensating Plaintiff for the Department's constitutional violations and (b) deterring the Department from future violations. The answer is no, on both counts.

B. <u>Plaintiff does not meet the "high threshold" to show that the Act is preempted by the purposes of Section 1983.</u>

Section 1983 provides that every person who, under color of state law, violates another person's federal civil rights "shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. Nothing in its text or statutory structure demonstrates Congress "clearly intended" section 1983 to deter future violations of federal law. And it says nothing about compensating victims. All that is clear from the text is that Congress intended to create a private cause of action against state officials violating federal law. The Act does not affect such causes of action.

Indeed, Plaintiff does not cite the text or statutory structure of 42 U.S.C. § 1983 anywhere in his Motion. Nor does he even cite a single piece of legislative history or statutory context to establish the alleged purposes and objectives of section 1983. Instead, he cites opinions from the Eleventh Circuit and Supreme Court discussing the purposes of section 1983 claims in unrelated, non-preemption contexts. *See, e.g.*, *Wyatt v. Cole,* 504 U.S. 158, 161 (1992) (discussing purpose of section 1983 in qualified immunity context); *Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 307 (1986) (damage awards); *Owen v. City of Indep., Mo.,* 445 U.S. 622, 651-52 (1980) (qualified immunity);

*Carey v. Piphus,* 435 U.S. 247, 257-58 (1978) (damage awards); *Robertson v. Wegmann,* 436 U.S. 584, 590–91 (1978) (state survivorship statute); *Gilmere v. City of Atlanta, Ga.,* 864 F.2d 734, 747 (11th Cir. 1989) (damage awards).

But the Supreme Court has warned that "[h]efty inferences may be required . . . when trying to estimate whether Congress would have wanted to prohibit States from pursuing regulations that may happen to touch, in various degrees and different ways, on unenacted federal purposes and objectives." *Va. Uranium*, 587 U.S. at 778. "Worse yet," the Court notes, "in piling inference upon inference about hidden legislative wishes we risk displacing the legislative compromises actually reflected in the statutory text." *Id.* And "[i]n disregarding these legislative compromises, we may only wind up displacing perfectly legitimate state laws on the strength of 'purposes' that only we can see, that may seem perfectly logical to us, but that lack the democratic provenance the Constitution demands before a federal law may be declared supreme." *Id.* That is why the Court reiterated in *Whiting* that preemption claims "d[o] not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" because "such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Whiting,* 563 U.S. at 607 (citation modified).

But that is exactly what Plaintiff asks this Court to do here – preempt a valid state statute based not on the text of a federal statute, but rather on judicial pontificating in entirely unrelated contexts. The Supreme Court, however, has made clear that "to order preemption based not on the strength of a clear congressional command, or even

12

on the strength of a judicial gloss requiring that much of us, but based only on a doubtful *extension* of a questionable judicial gloss would represent not only a significant federal intrusion into state sovereignty," but also a "significant judicial intrusion into Congress's authority to delimit the preemptive effect of its laws." *Va. Uranium*, 587 U.S. at 773 (emphasis original).

Indeed, the Eleventh Circuit recently rejected a preemption claim that relied on more reliable, but also non-textual, purposes and objectives of a federal statute. In *Marrache v. Bacardi U.S.A., Inc.*, a consumer brought a class action suit against the Bombay spirits brand and the Winn-Dixie supermarket chain. 17 F.4th at 1090. The consumer asserted claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and for unjust enrichment, alleging that one of Bombay's gin brands, which Winn-Dixie sells in its stores, violates section 562.455, Florida Statutes, which prohibits adding grains of paradise and other unsafe substances to alcohol. *Id.* The Defendants moved to dismiss and alleged that the Food Additives Amendment ("FAA") to the Federal Food, Drug, and Cosmetic Act ("FFDCA") preempted section 562.455 because the Florida statute frustrated the purposes and objectives of the FAA. *Id.* at 1091.

Defendants' preemption argument in *Marrache* relied entirely on statements contained in the legislative history of the FAA. *Id.* at 1096. Specifically, Defendants argued that statements in a Senate report and in the Congressional record regarding the purposes of the FAA demonstrate that Congress passed the amendment to "establish

13

a national repository of safe ingredients upon which consumers and manufacturers could rely" and "to prevent rules that unnecessarily prohibit access to safe food ingredients." *Id.* at 1096.

The Eleventh Circuit, however, reiterated that "[t]he 'plain' in 'plain meaning' requires that we look to the actual language used in a statute, not to the circumstances that gave rise to that language." *Id.* (quoting *CSX Corp.*, 909 F.3d at 369); *see also, e.g., Va. Uranium*, 587 U.S. at 777-79. And it determined that "Congress's purpose in enacting the Food Additives Amendment—as derived from the statutory text—was to prohibit unsafe food additives from being included in food and alcohol to protect the health and safety of the public." *Id.* at 1097. Accordingly, given that prohibiting grains of paradise and other unsafe additives "does not frustrate that purpose," the Eleventh Circuit concluded that the FAA did not preempt section 562.455.

Moreover, as discussed, there is a presumption against preempting the historic police powers of the states "unless that was the clear and manifest purpose of Congress." *Fresenius*, 704 F.3d at 939-40 (quoting *Arizona*, 567 U.S. at 400). This presumption is especially strong where "Congress has 'legislated . . . in a field which the States have traditionally occupied.'" *Lohr*, 518 U.S. at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). For example, "the supervision of the readying of foodstuffs for market has always been deemed a matter of peculiarly local concern," and "the States have always possessed a legitimate interest in 'the protection of (their) people against fraud and deception in the sale of food products' at retail markets within

their borders." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144 (1963) (quoting *Plumley v. Massachusetts*, 155 U.S. 461, 472 (1894)). The same is true here. The States "have long been the primary regulators of crime and punishment." *Beeks v. Hundley*, 34 F.3d 658, 662 (8th Cir. 1994); *see also Knapp v. Schweitzer,* 357 U.S. 371, 374-78 (1958). Therefore, "[f]ederal regulation of [criminal justice issues] should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Nat'l Ass'n of State Util. Consumer Advocs. v. FCC*, 457 F.3d 1238, 1252 (11th Cir. 2006) (quoting *Fla. Lime*, 373 U.S. at 142). As shown, Plaintiff does not come close to demonstrating either reason.

Worse yet, "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Wyeth,* 555 U.S. at 575 (quoting *Bonito Boats v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 166–67 (1989)). For example, the Supreme Court in *Wyeth v. Levine* concluded that state laws did not stand as an obstacle to the objectives of the FFDCA, in part, because "[i]f Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history." *Id.* at 574-75. ("Its silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug

safety and effectiveness."). Again, the same rule applies here. Congress passed section 1983 in 1871, more than 150 years ago. *Civil Rights Act of 1871*, ch. 22, § 1, 17 Stat. 13 (1871). And Congress is certainly aware of state civil restitution laws, given that at least 36 states currently have such laws on the books, and the practice dates back to the 1840s.[1] If Congress believed such state laws posed an obstacle to the purposes of section 1983 claims, it could and would have addressed it in the text. But it has not.

Thus, based on both the text of section 1983 and the presumption against preempting the historic police power of states, Plaintiff does not meet the "high threshold" for preemption.

C. <u>Even accepting Plaintiff's proffered purposes for Section 1983, Florida's cost of incarceration statute does not stand as an obstacle to accomplishing or executing those purposes.</u>

Plaintiff's argument for why applying Florida's cost of incarceration statutes to his section 1983 settlement allegedly conflicts with section 1983 relies entirely on two non-binding opinions from the Eighth and Second Circuits. But both are factually distinct from the facts here. In fact, their distinctions demonstrate why section 1983 does not preempt the cost of incarceration liens applied to Plaintiff's settlement. What's more, the Eleventh Circuit has noted its skepticism of the Eighth Circuit opinion. Thus, even accepting Plaintiff's proffered purposes of section 1983, the provision does not

---

[1] *See* Dale Parent, Nat'l Inst. of Justice, Dep't of Justice, Recovering Correctional Costs Through Offender Fees (June 1990), Appendix D, Table D-2; https://www.ncjrs.gov/pdffiles1/Digitization/125084NCJRS.pdf (last viewed February 4, 2019).

16

preempt Florida's cost of incarceration statute, and therefore the Department is entitled to summary judgment.

**1.** First, Plaintiff offers the Eighth Circuit's decision in *Hankins v. Finnel*, 964 F.2d 853 (8th Cir. 1992). There, a state inmate brought a section 1983 suit against a Missouri prison employee for sexual harassment, and the jury awarded him $1 in nominal damages and $3,000 in punitive damages. *Id.* at 854. The State of Missouri agreed to indemnify the inmate for the judgment against him pursuant to a State Legal Expense Fund. *Id.*; *see also* Mo. Rev. Stat. § 105.711 (Supp. 1991). The State of Missouri then sought, and the sentencing court imposed, a cost of incarceration lien against 90% of the inmate's section 1983 award pursuant to Missouri's Incarceration Reimbursement Act. *Id.* at 855. And three days later the State withdrew more than $3,200 from his inmate account. *Id.*

The inmate filed suit to challenge the lien, claiming that the Missouri lien statute was preempted because it frustrated the objectives of section 1983. *Id.* The Eighth Circuit agreed, concluding that "[t]o allow the State to largely recoup [a plaintiff's section 1983] award would be inimical to the goals of [section 1983]." *Id.* at 861. The Court explained that allowing Missouri to recover the funds it paid pursuant to a section 1983 award eliminates the deterrent effect of that statute. *Id.* Thus, "[t]o the extent that [Missouri's cost of incarceration statute] permits the State to recoup the very monies it has paid to satisfy a section 1983 judgment against one of its employees, the [statute] is

17

invalidated under the Supremacy Clause." *Id.* The Court did not discuss whether the lien statute frustrated section 1983's compensatory purpose.

**2.** The Eighth Circuit, however, limited *Hankins* just two years later in *Beeks v. Hundley.* 34 F.3d at 658. In fact, the Eleventh Circuit recognized this while signaling its skepticism of *Hankins*, noting that its sister circuit "limited *Hankins* by holding that an inmate's section 1983 award may constitutionally be applied to a victim restitution lien imposed on an inmate's assets because such an application is not inimical to the goals of § 1983." *Rinaldo v. Corbett*, 256 F.3d 1276, 1281, 1281 n.9 (11th Cir. 2001) (citing *Beeks*, 34 F.3d at 658). The *Beeks* opinion validates the skepticism of *Hankins* and demonstrates why applying it here dictates a different result.

In *Beeks*, Iowa's victim restitution statute requires that offenders convicted of all but simple misdemeanors pay restitution to their victims. *See* Iowa Code Ann. § 910.2. And the statute allows the Iowa Department of Corrections to deduct restitution payments from inmate accounts to satisfy their debt. *See* Iowa Admin. Code § 201-20.11(7)-(10). Accordingly, Iowa's Department of Corrections withdrew all but $50 from a section 1983 award given to Beeks to satisfy his obligation under the restitution statute. *Beeks*, 34 F.3d at 660. Beeks sued, alleging that *Hankins* exempted section 1983 damages from Iowa's restitution statute. *Id.* The district court agreed, but the Eighth Circuit reversed, concluding that "[t]his case does not present the same concerns [as *Hankins*]" on both deterrence and compensation. *Id.* at 661. So too here.

18

First, deterrence. In *Hankins*, the Eighth Circuit concluded that Missouri prison officials imposing a cost of incarceration lien upon the section 1983 award they paid to an inmate completely undermined the deterrent effect of that award. That is because, the Court explained, the lien allows the penal system to recoup the funds it paid out under the judgment, which means that going forward "neither the State nor its employees would have the incentive to comply with federal and constitutional rights of prisoners." *Hankins*, 964 F.2d 861 (quoting *Hankins v. Finnel*, 759 F. Supp. 569, 574 (W.D. Mo. 1991)).

The *Beeks* Court, however, noted that "[t]his case does not present the same concerns" because "the money [withdrawn from the inmate's account] was applied to the inmates' pre-existing obligations to the victims of their crimes." 34 F.3d at 661. In other words, Iowa's victim restitution regime did not "permit the state institution whose employees were responsible for the § 1983 violation to recoup the money judgment." *Id.* In such circumstances, the Eighth Circuit concluded that "victim restitution does not defeat § 1983's deterrence goal." *Id.* Similar to *Beeks*, Plaintiff's obligations pre-exist his section 1983 claim because his liability was determined at the time of sentencing. *See* § 960.293(2), Fla. Stat. The deterrence goal of section 1983 is not thwarted as the state's funds are ultimately being used to satisfy an existing debt to the state owed by Plaintiff.

Additionally, the State of Florida's Division of Risk Management indemnified the Department employees that allegedly violated Plaintiff's federal rights and paid out the settlement on their behalf. Def.'s Resp. to RFA Nos. 9, 11, ECF No. 53-1 at 6-7;

19

Def.'s Supplemental Resp. to RFA No. 10, ECF No. 53-2 at 3. And the Department imposed the cost of incarceration lien upon Plaintiff's inmate trust account by withdrawing all funds from the account to attempt to satisfy the lien. Def.'s Resp. to RFA No. 27, ECF No. 53-1 at 11. But the Department did not retain a single cent of those funds and has no control over how they are spent. Instead, pursuant to section 945.215(1)(d), Florida Statutes, the Department deposited the funds into the State's general revenue fund, where they will remain until appropriated by the Legislature. Def.'s Resp. to Interrog. No. 3, ECF No. 53-7 at 5. Thus, Florida's civil restitution scheme, just like Iowa's, does not permit the state institution allegedly "responsible for the § 1983 violation to recoup the money judgment." *Beeks*, 34 F.3d at 661.

In addition, the Eighth Circuit in *Beeks* noted there was no evidence Iowa's victim restitution scheme was intended to frustrate section 1983 plaintiffs or to reduce the deterrent effect of section 1983 judgments because "the statute uniformly affects all offenders, not only those who have prevailed in a federal civil rights action." *Id.* at 662. Again, same here – the Act applies to all offenders. *See* §§ 960.292-960.295, Fla. Stat. Thus, although victim restitution and cost of incarceration liens may "discourag[e] settlements or alternative dispute resolution, that is not a sufficient basis to preempt the State's admittedly strong interest in its [civil restitution] program." *Id.* For both reasons, the Department's cost of incarceration lien did not frustrate the deterrent effect of section 1983 awards and settlements.

As for compensation, the Eighth Circuit recognized that imposing a victim restitution lien deprives Beeks "of the immediate benefit of the diverted portions of [his] § 1983 money judgment." *Id.* at 661. But importantly, the Court emphasized that under Iowa's victim restitution statute, "the diverted payments satisfy a portion of [Beeks'] restitution orders—debts that constitute a judgment and lien against all their property and, significantly, are enforceable after their prison sentences have been served." *Id.* Thus, the Court concluded that the statute "does not significantly affect § 1983's compensatory purpose" because "[Beeks] received virtually all the benefit of [his] § 1983 money judgment when the proceeds were applied to satisfy [his] restitution deb[t]." *Id.* So too here.

Under the Act, convicted offenders "shall incur civil liability for damages and losses to crime victims, the state, its local subdivisions, and aggrieved parties." § 960.292(1), Fla. Stat. The liability attaches "[u]pon conviction" and courts retain jurisdiction over the offender to enter lien orders for up to 5 years after release from incarceration or supervision, whichever is later. § 960.292(1)-(2), Fla. Stat. Here, upon his conviction, Plaintiff was liable to the State of Florida for $547,850 for incarceration and other correctional costs. *See* § 960.293(2)(b), Fla. Stat. And, just like the plaintiff in *Beeks*, Plaintiff's civil liability is a debt that will remain enforceable even after his sentence concluded. §§ 960.292(2) and 960.294(4), Fla. Stat. Thus, the Department, by imposing the cost of incarceration lien and diverting the funds in Plaintiff's inmate trust account to the State's general revenue fund, satisfied more than half of his existing debt

21

to the State. In other words, despite losing access to his section 1983 settlement, Plaintiff received virtually all of the benefits of those funds, which means the Department's lien "d[id] not significantly affect § 1983's compensatory purpose." *Beeks*, 34 F.3d at 661.

*Hankins* is inapposite for another reason. The Supreme Court, when discussing the compensatory purpose of section 1983, emphasized that the goal is to "provide compensatory relief *to those deprived of their federal rights by state actors*." *Felder v. Casey*, 487 U.S. 131, 141 (1988) (emphasis added). The inmate in *Hankins* obtained a judgment declaring that a Missouri prison official had violated his federal rights. 964 F.2d at 854. Here, however, Plaintiff settled his claims against the Department and Centurion before a court could try them and without the defendants admitting liability and the court dismissed the claims. Def.'s Resp. to RFA No. 8, ECF No. 53-1 at 6; Baez Decl., ECF No. 53-3 at ¶ 6; Order of Dismissal, ECF No. 53-4. Thus, imposing a lien on Plaintiff's settlement proceeds does not frustrate the goal of compensating "those deprived of their federal rights" because no court has found that the Plaintiff's federal rights were deprived.

**3.** Plaintiff also cites (albeit in a parenthetical) the Second Circuit's recent decision in *Williams v. Marinelli*, 987 F.3d 188 (2d Cir. 2021). But the facts are again inapposite here and thereby do not support preemption.

There, plaintiff brought a section 1983 action against Connecticut prison officials alleging deliberate indifference to unsafe conditions under the Eighth and Fourteenth

22

Amendments. *Id.* at 194. The jury ruled for Mr. Williams and awarded him $250,000 in compensatory damages. *Id.* It also found that Mr. Marinelli's conduct was malicious or reckless and thereby awarded Mr. Williams $400,000 in punitive damages.[2] After the trial, the State of Connecticut voluntarily paid the judgment on Mr. Marinelli's behalf by directing a small portion of the funds towards a child support lien against Mr. Williams, half of the remainder to the State of Connecticut under a state law requiring offenders to reimburse the state for the costs of their incarceration, and the other half to Mr. Williams's inmate trust account. *Id.* The State also filed a lawsuit against Mr. Williams in state court to recover almost $50,000 in public defender costs for his defense. *Id.* at 195.

In response, Mr. Williams filed suit to declare that Connecticut's cost of incarceration statute, as applied to his damages award, was preempted by section 1983. *Id.* The district court concluded that the state's voluntary indemnification of Mr. Marinelli and attempt to recoup more than half of Mr. Williams's judgment "virtually . . . nullif[ied] [the] judgment, leaving it with little deterrent or compensatory value and thereby undermin[ed] Congress's purposes in enacting Section 1983." *Id.* (quoting *Williams v. Murphy*, No. 3:13-CV-01154 (MPS), 2018 WL 2016850, at *1 (D. Conn. Mar. 29, 2018)). Indeed, the court noted that the State's actions sent corrections employees the message that "even when they maliciously violate an inmate's civil rights, neither

---

[2] The Court subsequently granted Mr. Marinelli's motion for remittitur and reduced the award to $250,000 in compensatory and $50,000 in punitive damages. *Id.*

they nor their employer will suffer significant financial consequences." *Murphy*, 2018 WL 2016850, at *1.  And finding that this result "starkly clash[ed]" with Congress's purposes in enacting section 1983, the district court preempted applying the cost of incarceration statute to Mr. Williams's section 1983 award. *Id.*

The Second Circuit agreed, concluding that Connecticut's actions "conflict irreconcilably with § 1983's purpose of deterring constitutional violations" because "[t]he deterrent effect of Williams's § 1983 award is eviscerated if both the constitutional tortfeasor and his employer, the State, are relieved of the bulk of the financial consequences of the violation." *Marinelli*, 987 F.3d at 201. But the opinion did not even address whether the cost of incarceration lien frustrated the alleged compensatory purpose of section 1983. *Id.* at 204 ("Because we find that the State's actions so sharply conflict with § 1983's goal of deterrence that they are preempted, we express no view on the difficult question whether the State's actions conflict with § 1983's goal of compensation."). And the Court made clear – just like the district court – that its holding "[was] very much dependent on the facts of this case" and that "[i]t is not a broad holding that would prevent the normal operation of the Connecticut statutes in question." *Id.* at 201.[3]

---

[3] The district court made clear that "[its] ruling is limited to the peculiar facts of this case—where the State voluntarily indemnified an employee found to have committed malicious or reckless conduct and then attempted to recoup most of the judgment, thereby nearly eliminating its own indemnity expense." *Murphy*, 2018 WL 2016850, at *13. Indeed, the Court noted that "the State's [voluntary] indemnification of its employee for his malicious or reckless violation of Williams's civil rights is critical to

Specifically, the Second Circuit based its ruling on (1) the jury's finding that Marinelli "engaged in malicious or reckless violation[s] of Williams's rights"; (2) the serious injuries Mr. Williams suffered from that malicious or reckless conduct; and (3) the State voluntarily paying Mr. Marinelli's judgment obligations "in the face of his malicious or reckless harmful conduct [which] undermines the deterrent effect that the risk of personal liability otherwise would have on a state official." *Id.*

None of those facts apply here.[4] There was no jury finding that the Department violated Plaintiff's federal rights, much less that he did so through "malicious or reckless conduct." *See* Def.'s Resp. to RFA No. 8, ECF No. 53-1 at 6; Baez Decl., ECF No. 53-3 at ¶ 6; Order of Dismissal, ECF No. 53-4. As a result, Florida corrections officials did not seriously injure Plaintiff through malicious or reckless conduct. And Risk Management did not voluntarily pay the Florida corrections officers' judgment obligations. Rather, it did so pursuant to a certificate of coverage for federal civil rights liability issued to the Department pursuant to section 284.30, Florida Statutes, and authorized under section 284.33, Florida Statutes. *See also* Certificates of Coverage to Florida Department of Corrections for Federal Civil Rights Liability, ECF Nos. 53-8 at

---

[its] conclusion that its actions are preempted." *Id.* at *14. It explicitly stated that it "d[id] not hold that the State may never use the cost recovery statutes at issue in this case to reduce a Section 1983 award." *Id.*

[4] In addition, the Connecticut Department of Corrections – not the State of Connecticut – recoups the costs of incarceration pursuant to § 18-85, Conn. Gen. Stat. In Florida, on the other hand, the Florida Department of Corrections deposits those funds into the State of Florida's general revenue fund. *See* § 945.215(1)(d), Fla. Stat.

1 and 53-9 at 1; State Risk Management Trust Fund – Provisions for Federal Civil Rights Liability & Employment Discrimination Coverage, ECF No. 53-10 at 1-2. Thus, just like *Hankins*, *Williams* neither supports nor requires preemption here.

*    *    *

As demonstrated, the text of Section 1983 does not show that Congress clearly intended it to compensate plaintiffs for constitutional violations and deter future violations. But even accepting those proffered goals, Plaintiff does not demonstrate that the Act stands as an obstacle to accomplishing or executing those purposes. And the two cases he relies entirely upon for his argument are inapposite and do not support his argument. Accordingly, Plaintiff does not meet the high bar for obstacle preemption.

**II.    Accepting Plaintiff's argument would produce the absurd result that the Department could never file a cost of incarceration lien against inmates that obtained an award or settlement under section 1983.**

Taking Plaintiff's argument to its logical conclusion would mean that neither the Department nor the State of Florida could impose a cost of incarceration lien upon an inmate's section 1983 award or settlement because such liens automatically frustrate the purposes of section 1983. In other words, Plaintiff's argument would preclude the State of Florida from applying an inmate's section 1983 award or settlement to repay the victims of his crimes (as in *Beeks*) or satisfy his child support obligations (as in *Williams*). But Plaintiff does not cite a single piece of evidence suggesting that Congress intended to insulate section 1983 awards or settlements from such collection proceedings. And states across this country routinely go after such funds to satisfy similar obligations.

26

Thus, Plaintiff's argument would produce an absurd result. And it is well established that "[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *Daniels v. Exec. Dir. of Fla. Fish & Wildlife Conservation Comm'n*, 127 F.4th 1294, 1307 (11th Cir. 2025) (quoting *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982)); *see also United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1091 (11th Cir. 2018), *aff'd*, 587 U.S. 262 (2019) ("Of course, we should refrain from interpreting a statute in a way that 'produces a result that is not just unwise but is clearly absurd.'") (quoting *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001)).

## <u>CONCLUSION</u>

For these reasons, this Court should deny Plaintiff's Motion, grant the Department's motion, and enter summary judgment for the Department.

Dated: November 4, 2025                    Respectfully submitted,

/s/*Nicholas J.P. Meros*
NICHOLAS J.P. MEROS (FBN 120270)
**SHUTTS & BOWEN LLP**
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
(850) 241-1717
NMeros@shutts.com

*Counsel for Florida Department of Corrections*

27

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Pursuant to N.D. Fla. Local Rule 7.1(F), I hereby certify that this Motion complies with the Rule's font requirements and contains 6,746 words, exclusive of the case style, signature block, and any certificate of service.

/s/ *Nicholas J.P. Meros*
*Counsel for Florida Department of Corrections*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the Court's CM/ECF system, which provides notice to all parties, on November 4, 2025.

/s/ *Nicholas J.P. Meros*
*Counsel for Florida Department of Corrections*

28